**UNITED STATES of America,
Plaintiff,**

v.

**Manuel Guillermo CARRILLO, a/k/a "Psycho," a/k/a "Memo," Hector Hinojosa Gonzalez, a/k/a "Hector Hinojosa," a/k/a "Antonio Rameroz," a/k/a "Manuel Gonzalez," Raul Atayde, a/k/a "Bam Bam," Andres Jaquin Luna III, a/k/a "Buddha," Emiliano Zapata Licon, a/k/a "Zap," Roger Jiron, Juan Castorena, a/k/a "Chuco," Augustine Olivas, a/k/a "Chucky," Oscar Pacheco–Vasquez, a/k/a "Loco," Jose Manuel Aguilar Perez, a/k/a "Ruben Lopez–Gonzalez," a/k/a "Manny," a/k/a "Manuel," Jose Juan Melendez, Eduardo Rivera Morales, a/k/a "Eddie," a/k/a "Edwin Moras," Mark Jones, Brandy Jones, a/k/a "Rose," Defendants.**

**Crim. A. No. 99–CR–300–S.**

United States District Court,
D. Colorado.

Nov. 20, 2000.

1226

Alvin J. LaCabe, Stephanie Podolak, United States Attorney's Office, Denver, CO, for Plaintiff.

Arthur S. Nieto, Arthur S. Nieto, P.C., Richard N. Stuckey, Richard N. Stuuckey, P.C., Patrick J. Burke, Patrick J. Burke, Law Offices, Denver, CO, Richard A. Hostetler, Law Offices of Marks and Hostetler, Denver, CO, Eugene Scott Baroway, Baroway, Porter & Thomas, Englewood, CO, Robert William Pepin, Federal Public Defenders Office, Denver, CO, Clifford J. Barnard, Boulder, CO, Eugene Deikman, Eugene Deikman, P.C., Charles G. Leidner, Scott Jurdem, Buchanan, Jurdem & Zulauf, Denver, CO, Donald R. Knight, Littleton, CO, William Michael Whelan, Jr., Boulder, CO, Ralph B. Rhodes, Denver, CO, Edward A. Pluss, Edward A. Pluss Law Office, Denver, CO, John Henry Schlie, John F. Sullivan, III, John Henry Schlie & Barry A. Schwartz, PC, Denver, CO, Edward R. Harris, Denver, CO, Richard Kent Kornfeld, Isaacson, Rosenbaum, Woods & Levy, P.C., Denver, CO, Normando R. Pacheco, Denver, CO, Mark

Cameron Johnson, Boulder, CO, for Defendants.

## MEMORANDUM OPINION AND ORDER

SPARR, District Judge.

THIS MATTER is before the court on the following fifteen motions filed by the Defendants:

1. Defendant Carrillo's Motion to Suppress Intercepted Electronic and Wire Communications (filed September 21, 2000);

2. Defendant Hinojosa Gonzales' Motion to Suppress Electronic Communications and for *Franks* Hearing (filed September 25, 2000);

3. Defendant Atayde's Motion to Suppress Intercepted Communications (filed September 25, 2000);

4. Defendant Luna's Motion to Suppress Intercepted Electronic and Wire Communication (filed September 26, 2000);

5. Defendant Licon's Motion to Suppress Wiretap Evidence and for a *Franks* Hearing (filed September 26, 2000);

6. Defendant Castorena's Motion to Suppress Wiretaps (filed September 22, 2000);

7. Defendant Olivas' Motion to Suppress Evidence Derived from Wiretaps 99–WT–3–Z, 99–WT–4–Z, 99–WT–6–Z, and 99–WT–9–Z (filed September 25, 2000);

8. Defendant Pacheco–Vasquez' Motion to Suppress Wiretap Evidence (filed September 25, 2000);

9. Defendant Mark Jones' Motion to Suppress Intercepted Wire Communications (filed August 25, 2000); and

10. Defendant Brandy Jones' Motion to Suppress Evidence Seized Pursuant to Wiretap (filed September 24, 2000);

11. Defendant Carrillo's Motion to Join in Co–Defendant Motions to Suppress Intercepted Electronic and Wire Communications (filed September 21, 2000);

12. Defendant Licon's Motion for Leave to Join the Wiretap Suppression Motions of CoDefendants (filed September 26, 2000);

13. Defendant Jiron's Motion to Join Co–Defendant's [sic] Motions to Suppress Evidence Seized Pursuant to Wiretap (filed October 13, 2000);

14. Defendant Castorena's Motion to Join in Specific Motions Filed by Co–Defendants (filed May 9, 2000); and

15. Defendant Morales' Motion to Adopt (filed October 4, 2000).

All Defendants have joined in all of the motions listed above. The court has reviewed the motions, the Government's Consolidated Response (filed October 11, 2000), the extensive exhibits, the entire case file, the evidence and arguments presented at the hearing held November 1 and 2, 2000, and the applicable law and is sufficiently advised in the premises.

At the hearing held November 1 and 2, 2000, Defendants narrowed the arguments raised in their written motions. Defendants contend that the evidence obtained from 99–WT–3–Z, 99–WT–4–Z, and 99–WT–6–Z must be suppressed because the Affidavits in support of the Applications for interception of electronic communications failed to satisfy the "necessity" requirement set forth in 18 U.S.C. § 2518(1)(c).[1] In addition, Defendant Licon argues that the Affidavits in support of the Applications for interception of electronic communications failed to establish probable cause to believe that the interception of communications would produce evi-

---

**1.** In their written motions, several of the Defendants moved to suppress evidence that was derived from wiretap 99–WT–9–Z and the extension of 99–WT–9–Z. With Defendants' concession and because the Government does not intend to offer any evidence derived from wiretap 99–WT–9–Z or its extension in Criminal Action No. 99–CR–300–S, the Defendants' challenges to wiretap 99–WT–9–Z and the extension of 99–WT–9–Z will be addressed at a later date in the appropriate cases and will not be addressed in this case.

dence of his involvement in the criminal offenses outlined in the Applications.

## I.  The Challenged Wiretaps

### 1.  99–WT–3–Z

The first wiretap Order, issued April 6, 1999, authorized interception of communications from cellular telephone number (303) 810–5990, assigned Electronic Serial Number ("ESN") 25301332699 and purchased from AT & T Wireless by the FBI for use as an undercover phone in this investigation.  The subject cellular telephone was subscribed to by the FBI in the name of Curt Ramsey at an undercover address in Denver, Colorado, and was in the possession of and utilized by Raul Atayde.  The named targets and interceptees in the first wiretap Order were "members of the Manuel Carrillo drug distribution organization, including but not limited to ... Raul Atayde, Andres Luna, Manuel Carrillo, Hector Gonzalez, Augustine Olivas, Hilda Gutierrez, Omar Nunez, Emiliano Licon, and others yet unknown." (Government's Exhibit 3 ¶ A).  The first wiretap expired on May 5, 1999.  (*See* Government's Exhibits 1, 2, and 3).

### 2.  99–WT–4–Z

The second wiretap Order, also issued April 6, 1999, authorized interception of communications from a digital display paging device assigned telephone number (303) 836–6202 and purchased from Communications Unlimited by the FBI for use as an undercover pager in this investigation.  The subject pager was subscribed to by Curt Ramsey of the FBI at an undercover address in Denver, Colorado.  As of March 12, 1999, the subject pager was in the possession of and utilized by Raul Atayde.  On or about April 6, 1999, when 99–WT–3–Z commenced, the subject pager was transferred to the possession of Manuel Carrillo.  The named targets and interceptees in the second wiretap Order were Raul Atayde, Andres Luna, Manuel Carrillo, Hector Gonzalez, Augustine Olivas, Hilda Gutierrez, Omar Nunez, Emiliano Licon, and others yet unknown. (Gov-

ernment's Exhibit 5 ¶ A).  The second wiretap also expired on May 5, 1999.  (*See* Government's Exhibits 1, 4, and 5).

### 3.  99–WT–6–Z

The third wiretap Order, issued May 18, 1999, approximately two weeks after the first two wiretaps expired, authorized interception of communications from cellular telephone number (303) 898–3004 bearing ESN 25301438370.  The subject cellular telephone was subscribed to by Curt Ramsey of the FBI at an undercover address in Denver, Colorado, and was in the possession of and utilized by Manuel Carrillo.  The named targets and interceptees in the third wiretap Order were "members of the Manuel Carrillo drug distribution organization, including but not limited to" Raul Atayde, Andres Jaquin Luna III, Manuel Guillermo Carrillo, Hector Hinojosa Gonzalez, Hilda Gutierrez, Omar Nunez, Emiliano Zapata Licon, Angel LNU, Raul Garcia, Tomas Guerra, Oscar Pacheco–Vasquez, Oscar LNU, Alejandro Hernandez, Jose Juan Melendez, Chilas LNU, Augustine Olivas, Xavier Davis, and others yet unknown.  (Government's Exhibit 9 ¶ A).  The third wiretap expired on June 15, 1999.  (*See* Government's Exhibits 7, 8, and 9).

## II.  The Investigation

According to the Affidavits submitted in support of the three wiretap Applications, affiant Denver Police Officer/F.B.I. Special Federal Officer Jamie D. Akens began his participation in the investigation of the charged offenses in January of 1997.  The investigation in this case and related Criminal Action Nos. 99–CR–298–S and 99–CR–299–S spanned almost three years.

Through confidential sources, Officer Akens learned that Manuel Carrillo was the founder and leader of a violent Denver street gang known as the Mexican Criminal Mafia Sureno 13 ("MCM SUR 13") and that Carrillo was personally distributing and using others to distribute large quantities of cocaine and methamphetamine in

the Denver metropolitan area. Officer Akens learned that Andres Luna and Hector Gonzalez were members of the MCM SUR 13 and closely assisted Carrillo in the drug distribution business. The investigation focused on a conspiracy by members and associates of the Mexican Criminal Mafia to possess and distribute cocaine, crack cocaine, and methamphetamine.

The investigation revealed that Carrillo was in the middle of a drug distribution conspiracy that lasted from January 1997 until Carrillo went to jail in August 1999. The conspirators were members or associates of the Mexican Criminal Mafia and either supplied drugs to, purchased drugs from, or worked directly with Carrillo in the drug organization. The investigation showed that Carrillo obtained cocaine, crack cocaine, and methamphetamine from several sources, including but not limited to Hector Gonzalez, Jose Manuel Aguilar Perez, Jose Juan Melendez, and Eduardo Morales. Carrillo then distributed these drugs to other distributors, many of whom were members of the Mexican Criminal Mafia, including Raul Atayde, Andres Luna, Juan Castorena, Oscar Pacheco–Vasquez, and Augustine Olivas. These individuals then further distributed the drugs. Members of the drug organization acted as Carrillo's assistants by, *inter alia,* locating customers to purchase drugs, delivering drugs to customers, collecting money from drug sales, weighing and storing drugs at their homes and the homes of their relatives and girlfriends, serving as protection for Carrillo during drug transactions, and obtaining and carrying weapons for use during drug deals.

Many of Carrillo's assistants in the drug organization also worked for Carrillo as employees in two restaurants, the El Acapulco and the Acapulco Beach II.[2] These restaurants served as stash locations for drugs and guns. Conspirators used the telephones at the restaurants for drug deals and sold a substantial quantity of drugs from the restaurants. While in the restaurants, confidential sources observed numerous guns that were used in connection with the drug business.

Brothers in law Emiliano Licon and Roger Jiron were large buyers of and brokers for the Carrillo organization's drugs, primarily cocaine. Licon and Jiron each sold large quantities of cocaine in east Denver and Aurora. Mark and Brandy Jones were also large buyers of the Carrillo organization's drugs, primarily methamphetamine.

The investigation used surveillance, confidential sources, search warrants, witness interviews, undercover officers, pen registers, trap and trace information, toll record information, and records searches. These investigative methods revealed the conspirators in the company of other suspected participants in the drug conspiracy and confirmed some of the activities of the suspects. Several confidential sources provided Officer Akens information about numerous drug deals and other crimes committed by Carrillo and other members of the drug organization. Confidential sources observed large quantities of drugs and several handguns at Carrillo's residence and at the restaurants. During the course of the investigation, law enforcement agents continually attempted to corroborate by numerous means the information gained from confidential sources. Confidential sources and an undercover officer were able to make controlled purchases of narcotics from members of Carrillo's drug distribution organization between January 1997 and August 1999.

The investigation also focused on the drug trafficking activities of Hector Gonzalez that were separate from his dealings with the Carrillo drug organization. Hector Gonzalez was a primary supplier of drugs to Carrillo's drug distribution organization. The Gonzalez conspiracy charged in Criminal Action No. 99–CR–298–S began in July of 1999 and ended in September of 1999. The investigation re-

---

**2.** The El Acapulco closed in October 1998 and Carrillo opened the Acapulco Beach II, locat-  ed adjacent to the Days Inn Hotel at 620 Federal Boulevard in Denver, Colorado.

vealed that Hector Gonzalez was receiving shipments of marijuana in hundred-pound quantities and cocaine in kilogram quantities from sources in El Paso, Texas and Juarez, Mexico identified as Humberto Pelegrina and Manuel Aldo Yee Quintero. The investigators learned that shipments arriving in El Paso, Texas were transported to Denver, Colorado in automobiles by female "mules" hired by Alvaro Cano. Valerie Jarocki and Yadira Villalba were two of these "mules." The drugs were delivered to Hector Gonzalez in Denver and money was sent via couriers, such as Mario Najera, back to Mexico.

The investigation also revealed that Jose Arturo Hernandez–Rodriguez arranged cocaine deals between a Mexican source and Hector Gonzalez and that Alejandro Hernandez was a source of drugs for Hector Gonzalez. Thomas Cruz was a large buyer of marijuana from Hector Gonzalez. David Wallace was a significant buyer of marijuana from Cruz. Other associates of Hector Gonzalez in the drug business were Ricardo Gonzalez, Augustine Olivas, Raul Garcia, and Roberto Gutierrez Borjon. These individuals assisted Hector Gonzalez in distributing marijuana, cocaine and methamphetamine, collecting money, and locating drug customers. Ricardo Gonzalez, Augustine Olivas, and Raul Garda were also employed by Hector Gonzalez in a restaurant, La Playa del Acapulco, which was used as a front for drug trafficking and was the location of many of Gonzalez' criminal activities.

The stated objectives of the investigation that led to the Applications for 99–WT–3–Z and 99–WT–4–Z were to obtain admissible evidence of: (1) information leading to the identification of individuals supplying Raul Atayde, Andres Luna, Manuel Carrillo, Hector Gonzalez, Augustine Olivas, Hilda Gutierrez, Omar Nunez, Emiliano Licon, and others unknown with controlled substances; (2) information leading to the identification of persons distributing and transporting controlled substances on behalf of Raul Atayde, Andres Luna, Manuel Carrillo, Hector Gonzalez, Augustine Olivas, Hilda Gutierrez, Omar Nunez, Emiliano Licon, and others unknown; (3) information leading to the identification of times and locations of meetings during which Raul Atayde, Andres Luna, Manuel Carrillo, Hector Gonzalez, Augustine Olivas, Hilda Gutierrez, Omar Nunez, Emiliano Licon, and others unknown distribute controlled substances; (4) information leading to the identification of other communication facilities utilized by Raul Atayde, Andres Luna, Manuel Carrillo, Hector Gonzalez, Augustine Olivas, Hilda Gutierrez, Omar Nunez, Emiliano Licon, and others unknown in furtherance of their criminal activity; and (5) information leading to the identification of times of importation into and delivery of controlled substances to the District of Colorado. (Government's Exhibit 1 pp. 7–9).

The stated objectives of the investigation that led to the Application for 99–WT–6–Z were to obtain admissible evidence of: (1) information leading to the identification of individuals supplying Raul Atayde, Andres Luna, Manuel Carrillo, Hector Gonzalez, Hilda Gutierrez, Omar Nunez, Emiliano Licon, Angel LNU, Raul Garcia, Tomas Guerra, Oscar Pacheco-Vasquez, Oscar LNU, Alejandro Hernandez, Jose Juan Melendez, Chilas LNU, Augustine Olivas, Xavier Davis, and others unknown with controlled substances; (2) information leading to the identification of persons distributing and transporting controlled substances on behalf of Raul Atayde, Andres Luna, Manuel Carrillo, Hector Gonzalez, Hilda Gutierrez, Omar Nunez, Emiliano Licon, Angel LNU, Raul Garcia, Tomas Guerra, Oscar Pacheco-Vasquez, Oscar LNU, Alejandro Hernandez, Jose Juan Melendez, Chilas LNU, Augustine Olivas, Xavier Davis, and others unknown; (3) information leading to the identification of times and locations of meetings during which Raul Atayde, Andres Luna, Manuel Carrillo, Hector Gonzalez, Hilda Gutierrez, Omar Nunez, Emiliano Licon, Angel LNU, Raul Garcia, Tomas Guerra, Oscar Pacheco-Vasquez, Oscar LNU, Alejandro Hernandez, Jose

Juan Melendez, Chilas LNU, Augustine Olivas, Xavier Davis, and others unknown distribute controlled substances; (4) information leading to the identification of other communication facilities utilized by Raul Atayde, Andres Luna, Manuel Carrillo, Hector Gonzalez, Hilda Gutierrez, Omar Nunez, Emiliano Licon, Angel LNU, Raul Garcia, Tomas Guerra, Oscar Pacheco–Vasquez, Oscar LNU, Alejandro Hernandez, Jose Juan Melendez, Chilas LNU, Augustine Olivas, Xavier Davis, and others unknown in furtherance of their criminal activity; and (5) information leading to the identification of times of importation into and delivery of controlled substances to the District of Colorado. (Government's Exhibit 7 pp. 7–8).

III. Standard of Review

■ The judge to whom the application for a wiretap is submitted is vested with considerable discretion in his or her analysis. *United States v. Brone*, 792 F.2d 1504, 1506 (9th Cir.1986) (citation omitted); *United States v. Sandoval*, 550 F.2d 427, 429 (9th Cir.1976) (citation omitted). A defendant must make a prima facie showing that the wiretap was conducted pursuant to an illegal order. *United States v. Crumpton*, 54 F.Supp.2d 986, 1003 (D.Colo.1999) (citation omitted); *United States v. Barrios*, 994 F.Supp. 1257, 1261 (D.Colo.1998) (citation omitted). Not every failure to comply with Title III's requirements renders the interception of wire or oral communications unlawful. *United States v. Chavez*, 416 U.S. 562, 575, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974). A defendant must not only demonstrate a deviation from the requirements of the wiretap statute, but this deviation must be substantial. *Crumpton*, 54 F.Supp.2d at 1003 (citation omitted).

■ While the determination of necessity is a question of law subject to *de novo* review, "a wiretap authorization order is presumed proper, and a defendant carries the burden of overcoming this presumption." *United States v. Castillo–Garcia*, 117 F.3d 1179, 1186 (10th Cir.1997) (internal quotations marks and citation omitted);

see also *United States v. Killingsworth*, 117 F.3d 1159, 1163–64 (10th Cir.1997) (citation omitted); *United States v. Quintana*, 70 F.3d 1167, 1169 (10th Cir.1995) (citation omitted); *United States v. Mondragon*, 52 F.3d 291, 292 (10th Cir.1995) (citation omitted). Thus, the defendant carries the burden of persuasion on the legal question of whether the wiretaps were "necessary." *Castillo–Garcia*, 117 F.3d at 1186.

■ The district court's conclusion that a wiretap was necessary is reviewed for an abuse of discretion. *United States v. Armendariz*, 922 F.2d 602, 608 (10th Cir. 1990) (citation omitted); *United States v. Carneiro*, 861 F.2d 1171, 1176 (9th Cir. 1988) (citation omitted); *United States v. Zambrana*, 841 F.2d 1320, 1329–30 (7th Cir.1988). But see *Castillo–Garcia*, 117 F.3d at 1186 ("The question of whether the government demonstrated sufficient 'necessity' under 18 U.S.C. § 2518(1)(c) (1994) to support the issuance of a wiretapping order is a question of law which we review *de novo*."). The court need not attempt to resolve the issue of the proper standard of review of the necessity determination because the court would reach the same result under either standard of review. While this court owes no deference to the issuing judge in assessing whether the wiretaps were necessary, the court knows of no prohibition of this court's consideration of the issuing judge's findings regarding the necessity determination. (*See* Government's Exhibits 6 and 10).

■ The court may properly limit its *de novo* review of the issuing judge's necessity determination to the information before the issuing judge. *See United States v. Martinez*, 588 F.2d 1227, 1231–32 (9th Cir. 1978) (necessity determination made based on review of affidavit in support of wiretap application); *United States v. Anderson*, 542 F.2d 428, 431 (7th Cir.1976) (decision to authorize electronic surveillance should be upheld if the wiretap affidavit, viewed as a whole, reveals a "factual predicate" sufficient to support a finding of necessi-

ty); *United States v. Kail,* 612 F.2d 443, 447 (9th Cir.1979) (compliance with § 2518(1)(c) should be evaluated by viewing each affidavit in support of an electronic surveillance application as a whole); *United States v. Bennett,* 825 F.Supp. 1512, 1525 (D.Colo.1993) (citations omitted) ("[i]n determining whether the Government has substantially complied with the necessity requirement, it is appropriate to look both to the applications and the affidavits submitted with them").

Accordingly, the court confines its analysis to the information before the issuing judge: the Applications (Government's Exhibits 2, 4, and 8), the Affidavits in support of the Applications (Government's Exhibits 1 and 7), the *in camera* proceedings (Government's Exhibits 6 and 10), and the Orders Authorizing the Interception of Wire communications (Government's Exhibits 3, 5, and 9).

## IV.   The "Necessity" Requirement

▮   Pursuant to 18 U.S.C. § 2518(1)(c), an application for an electronic surveillance order must contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." Title 18 U.S.C. § 2518(3)(c) in turn provides that before a court issues an electronic surveillance order it must determine on the basis of the facts submitted by the applicant that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." "These two sections together make up the so-called necessity requirement for granting a wiretap order." *United States v. Ippolito,* 774 F.2d 1482, 1485 (9th Cir.1985). "[T]he government must show, by a full and complete statement, and the issuing court must find, that normal investigative techniques employing a normal amount of resources have failed to make the case within a reasonable period of time." *Ippolito,* 774 F.2d at 1486 (internal quotation marks and citation omitted).

▮   Each wiretap application, standing alone, must satisfy the necessity requirement. *Carneiro,* 861 F.2d at 1176 (citations omitted); *Brone,* 792 F.2d at 1507. The application or accompanying affidavit must contain, in writing, either a statement concerning alternate investigative procedures, or a statement incorporating that information by specific reference. *Mondragon,* 52 F.3d at 293. An affidavit in support of a wiretap application must show with specificity why in *this particular investigation* ordinary means of investigation will fail. *United States v. Robinson,* 698 F.2d 448, 453 (D.C.Cir.1983) (*per curiam*) (citations omitted) (emphasis in original).

▮   The purpose of the necessity requirement "is not to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques." *United States v. Dennis,* 786 F.2d 1029, 1035 (11th Cir.1986) (internal quotation marks and citation omitted). It is not necessary that every other conceivable means of investigation be exhausted or that a wiretap be employed only as a last resort. *Castillo–Garcia,* 117 F.3d at 1187; *Armendariz,* 922 F.2d at 607 (citation omitted); *United States v. Nunez,* 877 F.2d 1470, 1472 (10th Cir.1989) (citations omitted); *United States v. Apodaca,* 820 F.2d 348, 350 (10th Cir.1987) (citations omitted); *United States v. Abascal,* 564 F.2d 821, 825 (9th Cir.1977) (citations omitted). The "necessity" requirement of § 2518 is "simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn,* 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974) (citation omitted); *see also Castillo–Garcia,* 117 F.3d at 1187 (citation omitted).

▮   Because §§ 2518(1)(c) and (3)(c) are worded in the disjunctive, the government has three alternative ways to

establish the need for a wiretap. *United States v. Smith,* 31 F.3d 1294, 1298 n. 2 (4th Cir.1994). "[T]he government may establish the need for a wiretap by showing either: (i) that normal investigative procedures have been tried and failed, *or* (ii) that normal investigative procedures, though not yet tried, reasonably appear to be either 'unlikely to succeed if tried' *or* 'too dangerous.'" *Smith,* 31 F.3d at 1298 n. 2 (emphasis added). "The Government's burden of showing that other procedures reasonably appear unlikely to succeed or that they are too dangerous to use is not great .... Substantial compliance with the statute is all that is required." *Bennett,* 825 F.Supp. at 1525 (citations omitted). The government need only lay a factual predicate sufficient to inform the issuing judge why other methods of investigation are not sufficient. *United States v. McGlory,* 968 F.2d 309, 345 (3d Cir. 1992) (citation omitted). "[T]he government ·must show only that alternative means are likely, not certain, to fail." *Abascal,* 564 F.2d at 825.

■■■■■ Necessity is demonstrated where "normal investigative techniques employing a normal amount of resources have failed to make the case within a reasonable period of time." *United States v. Bailey,* 607 F.2d 237, 242 (9th Cir.1979) (internal quotation marks and citation omitted); *see also Ippolito,* 774 F.2d at 1486. "[T]he government must base its need on real facts and must specifically describe how it has encountered difficulties in penetrating the criminal enterprise or in gathering evidence with normal techniques to the point where wiretapping becomes reasonable." *United States v. Oriakhi,* 57 F.3d 1290, 1298 (4th Cir.1995) (internal quotation marks and citation omitted). Sufficient justifications for the use of electronic surveillance include "the identification of all the members of a conspiracy, learning the precise nature and scope of the illegal activity, the apprehension of accomplices, and the determination of the dimensions of an extensive conspiracy." *United States v. Mesa–Rincon,* 911 F.2d 1433, 1443 (10th Cir.1990). Where the ob-

jective is to discover the full scope of a drug operation, *i.e.* suppliers, major buyers, satellite conspirators, assets, the necessity requirement is met if normal investigative procedures have not succeeded in developing evidence against all members of the narcotics conspiracy. *United States v. Torres,* 908 F.2d 1417, 1422 (9th Cir. 1990).

■■■■■ The necessity requirement should be read in a common sense fashion to realize the statutory purpose of granting investigative discretion to law enforcement agents. *Oriakhi,* 57 F.3d at 1298; *see also Armendariz,* 922 F.2d at 607. The showing of necessity in an affidavit supporting a wiretap application must be tested in a "practical and common-sense fashion" after "consideration of all the facts and circumstances." *Castillo–Garcia,* 117 F.3d at 1187; *see also Sandoval,* 550 F.2d at 429 (internal quotation marks and citation omitted); *McGlory,* 968 F.2d at 345 (citation omitted); *Nunez,* 877 F.2d at 1472; *Abascal,* 564 F.2d at 825 (citation omitted); *United States v. Kalustian,* 529 F.2d 585, 589 (1975) (citation omitted). In evaluating the showing of the government's good faith effort to use normal alternative means because of danger or a low probability of success, the reviewing court should use a standard of reasonableness. *Ippolito,* 774 F.2d at 1486. The district court should not take too narrow and restrictive a perspective of the scope and objectives of the investigation. See *Sandoval,* 550 F.2d at 430.

The Tenth Circuit has named five normal investigative techniques that the government must address in its application for authorization to intercept wire communications:

... To obtain an electronic surveillance order, the government must explain fully in its application what investigative techniques have been tried against the target of the wiretap. 18 U.S.C. §§ 2518(1)(c), 2518(3)(c) (1994). If any of the four categories of normal investigative techniques referred to in the leg-

islative history of Title III have not been tried, the government must explain with particularity why each of such untried techniques would be either unsuccessful or too dangerous. Those investigative procedures are: (1) standard visual and aural surveillance; (2) questioning and interrogation of witnesses or participants (including the use of grand juries and the grant of immunity if necessary); (3) use of search warrants; and (4) infiltration of conspiratorial groups by undercover agents or informants. In addition, if other normal investigative techniques such as pen registers or trap and trace devices have not been tried, a similar explanation must be offered as to why they also would be unsuccessful or too dangerous. We add pen registers and trap and trace devices to this list because they possess a logical relationship and close affinity to wiretaps and yet are less intrusive. Thus, unless the government can show that they would be ineffective or dangerous they must be tried before resorting to wiretaps.

Whether other normal investigative techniques must also be explored before turning to wiretaps will depend on the unique circumstances of each investigation. For example, it will often be the case that the government must consider first the less intrusive technique of reviewing available public, private, or governmental records pertaining to the suspects under investigation to see if the requisite information needed to prosecute may be obtained in that way. However, we articulate no general rule as to such other normal investigative techniques because they are so dependent upon the nature of the investigation and the crimes being investigated....

*Castillo–Garcia,* 117 F.3d at 1187–88; *see also Killingsworth,* 117 F.3d at 1163.

Defendants argue that the Affidavits in support of the Applications for 99–WT–3–Z, 99–WT–4–Z, and 99–WT–6–Z failed to satisfy the "necessity" requirement set forth in 18 U.S.C. § 2518(1)(c), that is, that they did not contain "a full and complete

statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c); *see also* 18 U.S.C. §§ 2518(3)(c). More specifically, Defendants argue that: (1) because law enforcement agents achieved partial success with traditional investigative methods, there was no necessity for the wiretaps; (2) the Affidavits contained merely "boilerplate" language and conclusory statements of necessity for the wiretaps; and (3) the Affidavits failed to demonstrate necessity as to each and every target or individual whose communications were likely to be intercepted.

The court examines the three challenged wiretap Applications and Authorizations to determine whether they comply with Title III's necessity requirement.

## V. Analysis of "Necessity" Showing

### A. Partial Success of Traditional Investigative Methods

Defendants argue that because law enforcement agents achieved partial success with traditional investigative methods, there was no necessity for the wiretaps. With the benefit of $^{20}\!/_{20}$ hindsight Defendants suggest that the traditional investigative methods used by the Government were somewhat productive and that the Government could have continued to pursue its investigation by traditional methods.

■■■ "[T]he mere attainment of some degree of success during law enforcement's use of traditional investigative methods does not alone serve to extinguish the need for a wiretap." *United States v. Bennett,* 219 F.3d 1117, 1122 (9th Cir. 2000). Necessity will still exist even where traditional investigative procedures can lead to the successful development of evidence against some, but not all, members of a narcotics conspiracy. *Torres,* 908 F.2d at 1422. The court finds and concludes as follows that the Government's

explanations in the Applications for 99–WT–3–Z, 99–WT–4–Z, and 99–WT–6–Z comprise "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous" in compliance with 18 U.S.C. § 2518(1)(c).

### 1. 99–WT–3–Z and 99–WT–4–Z [3]

#### a. Standard visual or aural surveillance

The record is clear that investigators did extensive surveillance over a substantial period of time before applying for the wiretaps. Surveillance was done in connection with information provided by five confidential informants and numerous controlled purchases involving the confidential informants and the undercover officer. Surveillance was done on the restaurants that were used as covers for the Carrillo drug organization's activities. Surveillance was done at the residences of Carrillo, Luna, Gutierrez, Gonzalez, Atayde, and Atayde's girlfriend. Surveillance was done at locations where investigators believed drugs might be stored.

Officer Akens explained that surveillance was partially successful, but that surveillance could not accomplish the objectives of the investigation. Surveillance helped identify some of the participants in the conspiracy. However, some suspects sent others to conduct the drug transactions and rarely appeared personally. Surveillance merely revealed the suspects in the company of other suspected participants in the drug conspiracy, but surveillance could not reveal the nature of the suspects' meetings. Surveillance suggested possible locations where drugs and money were being stored but did not lead to the discovery of any drugs or cash. The success of visual surveillance was limited unless surveillance officers had some advance knowledge of the suspects' meetings at known locations. Surveillance would have been required on a 24–hour basis to monitor all of the suspects' activities. Surveillance could not conclusively establish the sources of the drugs and money, the locations where the drugs and money were being stored, or the roles of every conspirator.

The Affidavit explained that Carrillo, Luna, Gutierrez, and others were wary of being followed by law enforcement. Luna stated his concern that he was being followed by the police. Carrillo, Luna, Gutierrez, Atayde, and others utilized various driving techniques to evade surveillance by law enforcement officers, such as circling the neighborhood, driving at a high rate of speed, turning off all vehicle lights while driving at night, driving through red lights, weaving in and out of traffic, driving through parking lots, and making abrupt U-turns. A suspect's detection of surveillance can be dispositive of the standard surveillance prong of the Tenth Circuit's necessity test. *Castillo–Garcia,* 117 F.3d at 1191–92 (citation omitted).

The Affidavit explained that surveillance was of limited usefulness because the suspected conspirators were wary and rarely met or dealt with persons unknown to them. Meetings were set up by telephone in various public locations in or around Denver. The alleged crimes were conducted almost entirely by wire communications or in brief, closely guarded personal meetings. It was unlikely that surveillance could be conducted for long before it was detected by the suspects and the entire investigation was jeopardized.

The limited usefulness of surveillance was also discussed in the *in camera* hearings before Judge Weinshienk on April 6, 1999. (*See* Government's Exhibit 6). The issuing judge was "satisfied that there has been very careful details in these Affidavits and applications of the crimes and the reasons why there can't be other methods used." (Government's Exhibit 6 p. 16).

---

**3.** The Affidavit filed in support of the Application and Authorization Order in 99–WT–4–Z is identical to the Affidavit filed in support of the Application and Authorization Order in 99–WT–3–Z.

■ Defendant Atayde points out that Officer Akens did not mention every instance of surveillance of Atayde in the Affidavit. The omitted instances of surveillance did not lead to any enlightening or new information. The omissions identified by Defendant Atayde did not affect Officer Akens' conclusion as to the necessity for the wiretaps.

In sum, the court finds and concludes that the Affidavit in support of the Applications for 99–WT–3–Z and 99–WT–4–Z fully and completely explained that physical surveillance was tried and failed to reveal the scope of the drug organization and became dangerous to continue.

b. Questioning and interrogation of witnesses or participants (including the use of grand juries and the grant of immunity if necessary)

■ The Affidavit in support of the Applications for 99–WT–3–Z and 99–WT–4–Z explained several reasons why questioning of witnesses or participants was unlikely to succeed in developing evidence about the members of the Carrillo drug organization or was too dangerous.

In Officer Akens' general experience and in his specific experience with this investigation, the only persons with knowledge of the scope of the criminal conspiracy were the participants themselves. No known witness had knowledge of the full scope of the drug distribution network under investigation. The participants in the conspiracy were not likely to talk to law enforcement agents because of fear of reprisal by their confederates and reluctance to implicate themselves in criminal activity. The investigators had no basis to believe any of the participants would be willing to cooperate. There was little or no likelihood of developing any information through participants.

The entire investigation could have been jeopardized by pressing co-conspirators for information. The use of interviews or grand jury testimony would have alerted the other conspirators to the investigation. If called to testify before a grand jury, the subjects would likely have invoked their Fifth Amendment privilege. Any grant of immunity would have foreclosed prosecution of guilty individuals. If alerted to the investigation, many of the suspects would likely have fled the jurisdiction. The government's desire not to alert any of the targets of the investigation is reasonable. *Castillo–Garcia,* 117 F.3d at 1193.

Law enforcement agents attempted to interview potential witnesses where possible. Upon being asked to cooperate with law enforcement after his arrest, Luna indicated "I won't rat on my homies." On June 12, 1998, two individuals were arrested in New Mexico with twenty two pounds of marijuana that belonged to Carrillo. Upon being asked to cooperate with law enforcement after their arrest, the individuals refused. Defendants suggest that the investigators should have further pursued these possible witnesses. However, there was no reason to believe that these two individuals would have any information about the Carrillo drug organization's sources of cocaine, methamphetamine, or crack cocaine. The circumstances of this case demonstrate that it would be unreasonable for the court to require further pursuit of these two individuals.

During the execution of the search warrant at 3052 S. Zenobia St. on November 10, 1998, Gutierrez was arrested on outstanding warrants. Gutierrez spoke to Officer Akens that night and provided certain information about Carrillo's drug distribution organization. Shortly after her interview, Gutierrez refused to cooperate further with investigators. The Affidavit explained Officer Akens' concern that Gutierrez might be an unreliable witness because she was Carrillo's girlfriend, lived with Carrillo, was employed by Carrillo, and was an admitted crack cocaine user. Officer Akens also explained his concerns about jeopardizing the investigation and Gutierrez' safety. Officer Akens believed that Gutierrez might inform Carrillo of her discussion with investigators and compromise the investigation. Offi-

cer Akens knew that Carrillo had recently shot Gutierrez in the leg because he thought she was stealing drugs from him. Based on Carrillo's past violence toward Gutierrez, Officer Akens reasonably concluded that use of Gutierrez as a witness was too risky.

The Applications for 99–WT–3–Z and 99–WT–4–Z sufficiently established that questioning and interrogation of witnesses or participants, even under a grant of immunity, had not succeeded so far and was unlikely to succeed or would become too dangerous if attempted further. The Applications for 99–WT–3–Z and 99–WT–4–Z demonstrated sufficient necessity under this prong of the test set forth in *Castillo–Garcia*, 117 F.3d at 1187.

c. use of search warrants

■ The Affidavit in support of the Applications for 99–WT–3–Z and 99–WT–4–Z explained that the execution of search warrants had not and would not develop sufficient evidence to determine the scope of the drug conspiracy or the activities of the conspirators.

In general, search warrants would have been helpful only to the extent that the officers knew where to search and could establish probable cause for a warrant. Some of the suspects had more than one residence and were believed to keep drugs at various locations. Investigators reasonably expected that they would not find incriminating records in executing a search warrant. *See Castillo–Garcia*, 117 F.3d at 1189–90. Search warrants would have jeopardized the investigation before the completion of its objectives.

More specifically, on November 5, 1998, investigators conducted a canine sniff of and obtained a search warrant for a Cadillac driven by Carrillo. No drugs were recovered during the search. On November 10, 1998, investigators obtained a search warrant for Carrillo's residence at 3052 Zenobia St., Denver, Colorado. The search resulted in recovery of a handgun on Carrillo's person, but no drugs or other weapons were recovered.

While Officer Akens believed there was probable cause to obtain a search warrant for 1280 S. Raleigh St., Denver, Colorado, he reasonably determined that execution of a search warrant at that residence would jeopardize the overall investigation. Because that residence was believed to be only a temporary stash location used by Atayde, it was unlikely that a search would recover anything more than a small amount of drugs. A search of that residence would alert Atayde and other members of the Carrillo drug organization and could have jeopardized the safety of the undercover officer. At the time of the wiretap Applications, Officer Akens did not believe there was probable cause for any other search warrants.

The Applications explained that the execution of search warrants would not develop sufficient evidence of the drug conspiracy, such as Carrillo's suppliers of drugs, the methods of delivery, the identities of other conspirators, the location of the drugs and money, or the location and times of drug transactions. The Applications for 99–WT–3–Z and 99–WT–4–Z sufficiently established that the use of regular search warrants had not succeeded and was unlikely to succeed in leading to the identification and prosecution of the members of this drug trafficking conspiracy. The Applications also sufficiently demonstrated that the use of search warrants would jeopardize the investigation rather than succeed in determining the scope of the drug dealing activities of the Carrillo drug organization.

d. infiltration of conspiratorial groups by undercover agents or informants.

■ The investigation utilized five confidential informants and one undercover officer who were able to provide certain information and make numerous controlled purchases of drugs from some of the members of Carrillo's drug organization. However, the Affidavit in support of the Applications for 99–WT–3–Z and 99–WT–4–Z explained that the confidential informants

and the undercover officer had reached their maximum possible usefulness. The limited usefulness of the informants and the undercover officer was also explained in the *in camera* hearing before Judge Weinshienk on April 6, 1999. (*See* Government's Exhibit 6).

i. use of confidential informants

The Affidavit explained that CS–1 had not been able to determine who Carrillo's sources of supply were, from where the drugs were coming, or where the drugs were being stored before further distribution. While CS–1 conducted one or two drug transactions with Carrillo, CS–1 was not permitted to attend many of the drug deals and was usually confined to dealing with Luna. In addition, Officer Akens had determined that CS–1 could no longer appropriately be used as a proactive informant. Officer Akens became concerned that CS–1 was engaging in drug dealing with Carrillo because CS–1 had specifically ignored Officer Akens' directions and handled narcotics on two occasions without authorization. Officer Akens concluded that further pro-active use of CS–1 could compromise the entire investigation. Officer Akens continued to accept information that CS–1 gave him, but reasonably concluded that CS–1 was of no further proactive use in investigating the drug conspiracy.

The Affidavit also explained that CS–2 was not able to advance the objectives of the investigation. CS–2 never dealt directly with Carrillo or anyone higher up the drug supply chain. Carrillo directed CS–2 to deal with Luna, one of Carrillo's assistants, and CS–2 was able to make one controlled purchase of cocaine from Luna. CS–2 was also able to introduce an undercover officer to Luna. The Affidavit explained that CS–2 could not assist in investigating members of the conspiracy other than Luna and that the continued use of CS–2 was too dangerous. CS–2 feared for his/her safety based on Carrillo's involvement in two stabbings and a shooting, Luna's statement that before he went to prison he planned to drive around town

shooting at people, Luna's pending criminal charges, and Carrillo's statement "if people talk, people die". CS–2 could not infiltrate the drug organization without risk to his/her personal safety.

The Affidavit further described why CS–3 could not successfully achieve the objectives of the investigation. CS–3 never dealt directly with Carrillo or anyone higher up the drug supply chain. CS–3 dealt only with Luna. The investigators had no reason to believe that CS–3, a low-level marijuana dealer, would advance the investigation.

CS–4 provided information that Gutierrez, Carrillo's girlfriend, sometimes sold drugs for Carrillo and that Augustine Olivas was a drug runner for Carrillo. While CS–4 made one controlled purchase from Gutierrez, CS–4 had only limited dealings with Gutierrez and had no dealings with anyone else in the Carrillo organization. The Affidavit explained that CS–4 was unlikely to be able to provide any useful information about the Carrillo organization. CS–4 was also fearful of Carrillo based on his/her knowledge of Carrillo's prior acts of violence, that Carrillo owned numerous guns and that Carrillo had threatened a police officer.

CS–5 briefly provided information to investigators but quickly refused to cooperate against Carrillo and fled to Mexico out of fear of retaliation by Carrillo or others in Carrillo's organization.

Information could not be gained from informants who did not know the sources of the drugs. The known confidential informants had no knowledge about Carrillo's drug sources and could not realistically be used to investigate up the drug supply chain. *See Bennett,* 825 F.Supp. at 1525–26 (citations omitted) (necessity for wiretap found where other investigative measures failed to identify the members and scope of the conspiracy). Investigators had overseen sixteen controlled drug purchases but were no closer to the sources of the Carrillo organization's drugs. Investigators reasonably believed that it was

highly unlikely that Carrillo would introduce any of the informants to his suppliers. Necessity for a wiretap has been found where informants have failed to discover the source of the drug supply. *See Castillo–Garcia*, 117 F.3d at 1192. Wiretaps have been found necessary when traditional investigatory techniques alone could not lead to the apprehension and prosecution of the conspirators higher up in the drug distribution scheme. *See United States v. Plescia*, 48 F.3d 1452, 1463 (7th Cir.1995); *Sandoval*, 550 F.2d at 430.

All of the confidential informants expressed fear that they could be killed for assisting law enforcement. Some of the informants had heard Carrillo threaten Officer Akens' life. The reasonableness of the investigators' decision to forego further use of informants cannot seriously be questioned. Investigators knew of no other informants that could have been of any assistance.

ii. use of undercover officer

The record is clear that investigators utilized one undercover officer who was partially successful in achieving the objectives of the investigation. However, by March of 1999, the undercover officer had reached his maximum potential usefulness and was exposed to unreasonable danger.

The undercover officer made several small purchases from Luna but was unable to learn anything more about the sources of the drugs. Luna then referred the undercover officer to Atayde for future dealings. At the time of the wiretap Applications, investigators believed that Atayde was lower in the organization than Luna. The undercover officer made numerous drug purchases from Atayde. While prosecutions could have been initiated against Luna and Atayde based on the evidence obtained by the undercover officer, Officer Akens reasonably concluded that prosecution of these two individuals would not achieve the objectives of the investigation.

The conspirators were suspicious of the undercover officer. Luna indicated that he turned off his cellular telephone because he thought police were listening to his calls. Based on his suspicions, Luna stopped dealing with the undercover officer for more than three weeks in October and November of 1998. Atayde was cautious with the undercover officer, directing him to contact him only by pager and not at the restaurant telephone number. Atayde would not introduce the undercover officer to Carrillo. Carrillo almost never made personal contact with the undercover officer and attempted to conceal his identity from the undercover officer.

Investigators reasonably concluded that additional undercover agents likely could not infiltrate the drug organization and could not advance the investigation as to the drug sources. Despite the partial success of the undercover agent, investigators were unable to discover the main sources of the drugs. The suspected higher level conspirators were wary and sent lower level associates to conduct the transactions with informants and undercover officers. Additional drug purchases from Atayde by the undercover officer reasonably appeared unlikely to bring the investigation any closer to Carrillo or reveal the scope of the drug organization. Investigators reasonably concluded that it was highly unlikely that the undercover officer would meet any of Carrillo's suppliers. The undercover officer was unable to determine the other members of the conspiracy, the sources of the drugs, or where the drugs and money came from or went. Necessity for a wiretap has been found where an undercover agent has been unsuccessful in reaching the higher levels of a drug organization. *Killingsworth*, 117 F.3d at 1164.

By March of 1999, the undercover officer's efforts also were becoming too dangerous. Officer Akens had learned that CS–1 was handling drugs for the Carrillo organization without authorization. Because CS–1 would have recognized the undercover officer as a police officer, CS–1

could not be allowed near the undercover officer. This limited the effectiveness of the undercover officer and increased the danger to him. The decision not to expose the undercover officer to further risk to his safety cannot reasonably be questioned.

Defendants argue that the undercover officer was "underutilized" in the investigation. Based on three conversations on March 25, 1999 and one conversation on April 4, 1999, Defendants suggest that the undercover officer could have started working at the Acapulco Beach II and that another undercover officer could have been introduced to Atayde. Defendants also argue that more money should have been spent for undercover drug buys before a wiretap was sought.

First, the undercover officer would not have been safe working at the Acapulco Beach II, because surveillance inside the restaurant was not possible. Based on the circumstances of this investigation, including past incidents of violence perpetrated by members of this drug organization. Officer Akens reasonably concluded that allowing the undercover officer to work at the Acapulco Beach II was too dangerous.

Second, it was reasonable under the circumstances for Officer Akens to conclude that the undercover officer and any additional undercover officer would only continue to purchase drugs from Atayde and would not advance the investigation or learn the sources of the drugs or the scope of the drug operation. While the undercover officer had two contacts with Carrillo, all of his other contacts were with Luna or Atayde. The undercover officer had already made seven drug purchases in ever-increasing quantities from Atayde in an attempt to reach Carrillo and his drug sources, but these purchases had not resulted in any admissible evidence about the sources of the drugs and the larger scope of the Carrillo drug operation. The conversations referenced by the Defendants merely validate Officer Akens' conclusion that further undercover purchases would have been from Atayde.

Third, it would be unreasonable to require more undercover drug purchases under these circumstances. The investigation used confidential informants and an undercover officer to make at least seventeen drug purchases, including cocaine, methamphetamine, and crack cocaine, over a period of 27 months. The purchases began with one-ounce quantities, escalated to two- and three-ounce quantities, and culminated in a purchase of one pound of methamphetamine at a cost of $11,000.00 on February 4, 1999. The government is not required to expend an extraordinary amount of resources prior to seeking a wiretap. The government need only demonstrate that "normal investigative techniques employing a normal amount of resources have failed to make the case within a reasonable period of time." *United States v. Spagnuolo,* 549 F.2d 705, 710 (9th Cir.1977); *see also Ippolito,* 774 F.2d at 1486; *Bailey,* 607 F.2d at 242. After all of these purchases, the investigation had not revealed admissible evidence of Atayde's source, much less the scope of the Carrillo drug organization and its sources. It is clear under the Government's recitation of the facts that requiring the Government to attempt the unexhausted and unexplained investigative methods suggested by the Defendants would be unreasonable. The Government's failure to explicitly explain why it did not use the investigative methods suggested by the Defendants is not fatal to the wiretap application. *See Castillo–Garcia,* 117 F.3d at 1188.

The Applications for 99–WT–3–Z and 99–WT–4–Z fully and completely explained the attempted use of confidential informants and the undercover officer. The Applications for 99–WT–3–Z and 99–WT–4–Z sufficiently established that infiltration of conspiratorial groups by an undercover agent and five informants had been extensively tried and had been unsuccessful. The Applications for 99–WT–3–Z and 99–WT–4–Z fully and completely explained that investigators had exhausted the knowledge and usefulness of all the known informants and the undercover officer and

that continued use of the known informants and undercover officer would be too dangerous to continue. The Applications for 99–WT–3–Z and 99–WT–4–Z demonstrated sufficient necessity under this prong of the test set forth in *Castillo-Garcia*, 117 F.3d at 1187.

e. pen registers or trap and trace devices

■ "[I]f other normal investigative techniques such as pen registers or trap and trace devices have not been tried, a similar explanation must be offered as to why they also would be unsuccessful or too dangerous." *Castillo-Garcia*, 117 F.3d at 1187.

On March 11, 1999, pen registers and trap and trace devices were authorized on the subject cellular telephone and pager used by and in the possession of Atayde. The Applications for 99–WT–3–Z and 99–WT–4–Z explained that the pen register method reveals the date and time of both incoming and outgoing calls and the telephone numbers called from the particular telephone. The Applications explained that the trap and trace method reveals the origin of telephone calls made to a particular telephone number. The pen registers and trap and traces revealed that numerous calls were made from the subject cellular telephone to individuals and locations known to be connected to the Carrillo drug organization, including Carrillo, Luna, Atayde, Licon, and the Acapulco Beach II.

However, the pen registers and phone traps were of limited use. While pen register, trap and trace, and toll information was gathered and extensively analyzed, these methods cannot identify the persons making or receiving wire and electronic communications, the contents of the conversations, or whether they were in furtherance of the drug operation. These methods were used to corroborate the investigators' suspicions, but could not significantly advance the investigation. Use of pen registers and phone traps could not achieve the objectives of the investigation, such as identification of Carrillo's suppliers and distributors, the location and time of drug transactions, and the method of transportation and delivery of drugs and money.

The Applications for 99–WT–3–Z and 99–WT–4–Z sufficiently demonstrated that pen registers and phone trap and trace devices were tried but reasonably appeared to be unlikely to succeed in advancing the investigation. *See United States v. Garcia*, 232 F.3d 1309, 1315 (2000).

f. Review of available public, private, or governmental records pertaining to the suspects under investigation

■ The Applications explained that searches of criminal history and computer records revealed little about the suspected drug conspiracy. Searches of criminal records revealed only that several of the suspects had many prior arrests and/or convictions and gang affiliation. These records did not reveal any information regarding ongoing criminal activity. The Applications sufficiently demonstrated that records searches were inadequate to advance or complete the investigation.

2. 99–WT–6–Z

■ First, the Application for 99–WT–6–Z explained that the first thirty days of wiretap surveillance did not succeed in achieving the goals of the investigation. The conversations intercepted during the first wiretap confirmed that Atayde was dealing with customers under the direction of Carrillo and that Carrillo was dealing with individuals who were higher up the chain of supply for the drug organization. The first wiretap did not intercept any conversations that would lead to the drug sources. The Application for 99–WT–6–Z also explained that the continued use of conventional investigative techniques did not succeed in achieving the goals of the investigation. The targets of 99–WT–6–Z included all of the same targets of 99–WT–3–Z and 99–WT–4–Z plus additional individuals who had been determined to be involved in the drug distribution organization.

a. Standard visual or aural surveillance

The Application for 99–WT–6–Z explained that the use of standard surveillance continued to be unlikely to succeed. Surveillance was used in conjunction with the initial wiretaps and traffic stops to identify Xavier Davis, a significant customer of the Carrillo drug organization, and others associated with Davis. Surveillance also revealed the identity of some possible sources of drugs to the Carrillo drug organization.

Again however, surveillance merely revealed the suspects in the company of other suspected participants in the drug conspiracy but could not reveal the nature of the suspects' meetings and activities or their roles in the drug distribution business. The limited success of surveillance at this time in the investigation was only due to the information gained through intercepted conversations pursuant to the first wiretaps. Surveillance could only support speculation, not admissible evidence, as to who was supplying the drugs to the Carrillo organization.

The use of surveillance was also becoming extremely risky to the investigation. Luna and his mother had seen police outside their house. As a result, Luna took the cocaine that he was storing at his house and put it behind a dumpster in the alley behind his house. The police seized the cocaine from the alley in a warrantless search of the alley. Atayde and Carrillo became suspicious of Luna because of the disappearance of the cocaine. Also in April of 1999, when Atayde called for a taxi, a female dispatcher for the Metro Cab Company alerted him that the police were following him.

The problems with surveillance were also discussed in the *in camera* hearing before Judge Weinshienk on May 18, 1999. (*See* Government's Exhibit 10). The issuing judge concluded that "surveillance has not been very successful or really is dangerous." (Government's Exhibit 10 p. 7; *see also* p. 12).

In sum, the Application and Affidavit for 99–WT–6–Z sufficiently established that standard surveillance had been tried and was unsuccessful in advancing the investigation and had become too dangerous.

b. Questioning and interrogation of witnesses or participants (including the use of grand juries and the grant of immunity if necessary)

The Application for 99–WT–6–Z explained that the use of general questioning or interrogation of witnesses and participants continued to be unlikely to succeed and too dangerous.

The first thirty days of wire interceptions and the ongoing traditional investigative techniques demonstrated that any possible witnesses would not cooperate or advance the investigation. The only persons with knowledge of the scope of the criminal conspiracy continued to be the participants themselves. No known witness had knowledge of all of the participants or the full scope of the drug conspiracy. Obviously, the use of interviews or grand jury testimony would have alerted the other conspirators to the investigation. If alerted to a grand jury investigation, many of the suspects would likely have fled the jurisdiction to escape prosecution. Any grant of immunity could have foreclosed prosecution of guilty individuals. Officer Akens reasonably concluded that the participants in the conspiracy were not likely to talk to law enforcement. The witnesses and participants contacted by the Government thus far had refused to cooperate.

The questioning of witnesses or participants would have been dangerous. Carrillo and other members of his organization did not hesitate to threaten and use violence. Carrillo had assaulted Garcia and had threatened Licon when he believed they were competing for his drug customers. Atayde threatened Angel when she said she wanted to throw away his drugs. Carrillo indicated that he would be carrying a gun to meet with Davis. Officer Akens reasonably concluded that ap-

proaching potential witnesses would be too dangerous.

The Application and Affidavit for 99–WT–6–Z sufficiently established that questioning and interrogation of witnesses or participants was unlikely to succeed if tried and was too dangerous.

### c. use of search warrants

The Application for 99–WT–6–Z explained that the further use of search warrants was reasonably determined to be unlikely to succeed and too dangerous. The execution of search warrants would not develop sufficient evidence to identify the drug suppliers, the methods of delivery, or the purchasers. The warrantless search and seizure of cocaine from the alley behind Luna's home had heightened the conspirators' suspicions and Carrillo's animosity toward Luna. While Angel's home appeared to be used as a stash house, it was also the home of Angel's parents and her baby. Investigators reasonably determined that a search of Angel's home would be dangerous and would alert the targets to the investigation. Officer Akens did not believe that probable cause existed to search any other locations. Investigators reasonably believed that a premature search would compromise the safety of the undercover officer.

The Application for 99–WT–6–Z sufficiently demonstrated that the use of search warrants had failed and was unlikely to advance the investigation of this drug trafficking conspiracy and was too dangerous.

### d. infiltration of conspiratorial groups by undercover agents or informants.

The Application for 99–WT–6–Z explained in similar terms as the previous two wiretap Applications that the infiltration of conspiratorial groups by undercover agents or informants had reached its maximum potential usefulness and would not develop sufficient evidence about the conspiracy.

The Application explained that the known confidential informants could be of

no assistance to investigate further up the drug supply chain. The known confidential sources were fearful of reprisal from members of the conspiracy. Even after the first wiretap, investigators had not discovered any new informants with knowledge of the Carrillo drug organization. The usefulness of the known informants had been exhausted. A follow-up interview with CS–2 merely confirmed that Carrillo knew Alejandro Hernandez and that Hernandez may be involved in dealing methamphetamine. No confidential sources known to the investigators were acquainted with Carrillo's sources of drugs. Officer Akens' conclusion that none of the known informants could advance the investigation was reasonable.

The Application also explained why the use of the undercover agent had not been and would not be successful and was too dangerous. At this time in the investigation, the undercover agent was not making drug purchases from anyone other than Atayde. The undercover agent had not been able to determine the sources of the drugs. The participants showed signs of suspicion about the undercover officer. It was highly unlikely that the undercover officer would be introduced to the Carrillo organization's drug suppliers. The government sufficiently establishes the necessity for electronic surveillance where the wiretaps both allowed the government to ascertain the extent and structure of the conspiracy and to acquire enough evidence to convict the participants. See *Plescia*, 48 F.3d at 1463.

The Affidavit explained Officer Akens' reasonable conclusion that further attempts to use confidential informants and undercover officers were not likely to succeed. The Application sufficiently demonstrated that the further use of confidential informants and undercover officers was unlikely to advance the investigation of this drug trafficking conspiracy and was too dangerous.

e. pen registers or trap and trace devices

On April 13, 1999, a pen register and trap and trace device was authorized on the subject cellular telephone that was delivered to Atayde on April 17, 1999 and subsequently utilized by Carrillo. Pager, pen register, trap and trace, and toll information was gathered and extensively analyzed. The pen register and trap and trace revealed that numerous calls were made from the subject cellular telephone to individuals and locations known to be connected to the Carrillo drug organization, including Atayde, Acapulco Beach II, Gonzalez, Hernandez, Olivas, Pacheco, Luna, Elite Entertainment, and Melendez.

As in the previous two wiretap Applications, the Application for 99–WT–6–Z explained that the use of pen registers and trap and traces would not succeed in developing sufficient evidence about the conspiracy. The Application for 99–WT–6–Z explained that pen registers and phone traps were of limited use because these methods could not reveal the identities of the persons making or receiving phone calls, the nature of the business being conducted, the contents of the conversations, or whether they were in furtherance of the drug operation. The Application sufficiently demonstrated that pen registers and phone trap and trace devices would not advance the investigation. *See Garcia*, 232 F.3d 1309, 1315.

f. Review of available public, private, or governmental records pertaining to the suspects under investigation

The Application for 99–WT–6–Z also demonstrated that searches of criminal history and computer records were of little use in learning about the suspects or the drug conspiracy. Searches of criminal records revealed only that some of the suspects had prior arrests and/or convictions. These records did not reveal any information about the suspects' criminal activities during the investigation. The Application sufficiently demonstrated that records searches were inadequate to advance the investigation.

3. Conclusion Regarding Necessity for 99–WT–3–Z, 99–WT–4–Z, and 99–WT–6–Z

"To obtain an electronic surveillance order, the government must explain fully in its application what investigative techniques have been tried against the target of the wiretap. If any of the four categories of normal investigative techniques referred to in the legislative history of Title III have not been tried, the government must explain with particularity why each of such untried techniques would be either unsuccessful or too dangerous." *Castillo-Garcia*, 117 F.3d at 1187 (citations omitted).

In painstaking detail, Officer Akens' 89–page Affidavit in support of the Applications for 99–WT–3–Z and 99–WT–4–Z and 66–page Affidavit in support of the Application for 99–WT–6–Z specifically described the Government's extensive investigation efforts. (*See* Government's Exhibits 1 and 7). The record before the court shows that the Government extensively pursued traditional investigation techniques before applying for these three wiretaps. Investigators used several confidential informants, an undercover agent, surveillance, search warrants, pen registers, trap and trace records, telephone toll records, criminal records, and interviews with witnesses to discover that certain individuals were buying and selling large quantities of drugs. The Affidavits demonstrated with sufficient specificity that although the Government had some success in gathering evidence by other investigative techniques, interception of wire communications was needed to fully develop a prosecutable case. The Affidavits identified and described numerous shortcomings in the traditional techniques used. Normal investigative techniques had reached a standstill in penetrating a closely guarded drug distribution organization. Although other investigative measures had been utilized, albeit with some success as to lower level and peripheral conspirators, there was a genuine need

for more information regarding the scope of the conspiracy. The Affidavits demonstrate that normal investigative techniques had not succeeded in revealing the full scope of the drug organization or developing evidence against the suppliers, distributors, and primary customers. The Affidavits explain with particularity why further pursuit of normal investigative techniques would have been either unsuccessful or too dangerous.

In each wiretap Application, the Government met its obligation to identify specific circumstances indicating that traditional techniques could not reveal the broader picture. See *United States v. Simpson,* 813 F.2d 1462, 1472 (9th Cir. 1987). At the time of the wiretap Applications, investigators had substantial reason to believe that the Defendants were involved in an extensive drug conspiracy with possible international dimensions. It was clear that telephones were the primary means of communication between the conspirators. It would have been difficult if not impossible by means other than wiretap to determine the scope of the conspiracy or to develop enough evidence to successfully prosecute the conspirators. See *Garcia,* 232 F.3d 1309, 1316.

■■■ Defendants' arguments constitute nothing more than retrospective second-guessing. After-the-fact suggestions by defense attorneys as to how an investigation might have been handled are entitled to little weight in the analysis of statutory compliance with § 2518(1)(c). Merely because an "investigation technique is theoretically possible, it does not follow that it is likely." *Castillo–Garcia,* 117 F.3d at 1186 (internal quotation marks and citation omitted). The fact that the government could have taken some different or additional steps in its investigation does not demonstrate that the wiretap orders were issued in error. *Carneiro,* 861 F.2d at 1178 (citations omitted). "[T]he government need not exhaust or explain its failure to exhaust every conceivable investigative procedure before resorting to wiretapping." *Castillo–Garcia,* 117 F.3d

at 1187 (internal quotation marks and citation omitted). Courts will not invalidate wiretap orders merely because defense lawyers are able to suggest after-the-fact some investigative technique that could have been used and was not. *United States v. Webster,* 734 F.2d 1048, 1055 (5th Cir.1984) (citation omitted). Defendants' arguments that the investigation should have been conducted differently do not now make insufficient what was otherwise sufficient compliance with § 2518(1)(c). None of the omissions identified by the Defendants would have changed the showing of necessity for the wiretaps.

Drug trafficking is, by nature, "difficult to detect and presents formidable obstacles to identifying participants and defining their roles." *United States v. Velazquez–Feliciano,* 107 F.Supp.2d 134, 136 (D.P.R.2000). The necessity showing is established when the government in the wiretap application discussed the investigative techniques attempted and why they were unsuccessful. See *Killingsworth,* 117 F.3d at 1164–65. The record before the court sufficiently demonstrates the necessity of the wiretaps to attain the investigation's goals. Each Application described the necessity for the wiretap based on specific explanations of the difficulties encountered in gathering evidence as to the particular suspects and the scope of the particular drug distribution network. See *Castillo–Garcia,* 117 F.3d at 1196. The Applications and supporting Affidavits "etched the nature and contours" of this particular investigation. *Abascal,* 564 F.2d at 826. Each Affidavit related real facts and specifically described the difficulties encountered in penetrating the criminal conspiracy and gathering admissible evidence with normal techniques. See *Oriakhi,* 57 F.3d at 1298.

The Government sought permission to use wiretaps only when traditional methods of investigation proved ineffective in advancing the investigation or revealing the sources of the drugs and the scope of the drug operation. See *Carneiro,* 861

F.2d at 1178. The Government's explanations in its Applications for electronic surveillance contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). It is also clear from the Applications that requiring the Government to further attempt normal investigative techniques would not be reasonable. The information contained in the Affidavits supporting the Applications for 99–WT–3–Z, 99–WT–4–Z, and 99–WT–6–Z is sufficient to satisfy the "necessity" requirement of 18 U.S.C. §§ 2518(1)(c) and (3)(c) as interpreted by the Tenth Circuit.

## B. Use of Boilerplate

Defendants complain that the Affidavits in support of 99–WT–3–Z, 99–WT–4–Z, and 99–WT–6–Z rely on merely "boilerplate" language with respect to the issue of necessity for the wiretaps. After careful review of the Applications and supporting Affidavits for electronic surveillance of the telephones and pager in 99–WT–3–Z, 99–WT–4–Z, and 99–WT–6–Z, the court finds that they did not simply rely on boilerplate or conclusory recitations.

██ While the government's burden in making a necessity showing is not great, it "may not make the required showing through a mere boilerplate recitation of the difficulties of gathering usable evidence." *Oriakhi*, 57 F.3d at 1298 (citation omitted). "[G]eneralities, or statements in the conclusory language of the statute, are insufficient to support a wiretap application." *Castillo–Garcia*, 117 F.3d at 1188.

Applications for wiretaps are sought by the government when other means fail. These means are usually quite similar, if not identical. "[T]he fact that drug investigations suffer from common investigatory problems does not make these problems less vexing." *United States v. Milton*, 153 F.3d 891, 895 (8th Cir.1998). In cases of this nature, the same reasons for the futility of certain investigative techniques will recur. "[T]he use of identical language is inevitable in a case involving an extensive, long-term investigation involving multiple wiretaps ...." *Barrios*, 994 F.Supp. at 1271. "[A] judge issuing an intercept order may rely on stereotyped recitals in a wiretap application in determining that other investigative techniques reasonably appear to be unlikely to succeed if tried." *Bennett*, 825 F.Supp. at 1526.

The Government has done more than merely characterize this case as a drug conspiracy that is in general inherently difficult to investigate. *See Abascal*, 564 F.2d at 826; *Kalustian*, 529 F.2d at 589. The Applications and supporting Affidavits for 99–WT–3–Z, 99–WT–4–Z, and 99–WT–6–Z may have relied on some of the same facts, but they offered far more than mere boilerplate explanations regarding the limitations of traditional investigative techniques. *See Oriakhi*, 57 F.3d at 1298. The second Affidavit contained substantial new and particularized information since the first Affidavit about the drug conspiracy and its operations. Excessively formalistic analysis of the necessity requirement has been rejected where the circumstances regarding the efficacy of alternative methods of investigation have not changed. *Dennis*, 786 F.2d at 1035 n. 4. It is understandable under a common sense analysis that some of the information in the Applications for 99–WT–3–Z, 99–WT–4–Z, and 99–WT–6–Z was the same because the investigation was of the same drug organization and normal investigative methods had reached a dead end. This does not mean that the information can be considered "boilerplate."

██ The information provided in the first Application and Affidavit applies fully to the second Application and Affidavit. There is no evidence or reason to believe that the facts set forth in the first Affidavit had changed by the time of the second Affidavit. The facts demonstrate that the drug conspiracy continued in the same manner as initially described in the first Affidavit. The Government's Applications

and Affidavits contained specific facts chronicling the progress of the extensive investigation and detailing numerous reasons for concluding that traditional techniques had exhausted their usefulness. The Applications and supporting Affidavits explained the normal investigative techniques employed and the futility, disadvantages, or dangers of each of them specific to this investigation. *See Barrios,* 994 F.Supp. at 1271. Any arguably "boilerplate" language in the Affidavits was tied to and supported by specific details concerning this particular investigation.

This is not a case of "boilerplate" allegations regarding the difficulties of exposing drug conspiracies in general. Each Application and Affidavit adequately demonstrated the specific need for ongoing wire and electronic surveillance. The Applications and supporting Affidavits outlined the nature of the investigation with sufficient showing of necessity to allow the issuing judge reasonably to determine whether conventional investigative procedures were a viable alternative for investigating this conspiracy or reasonably appeared to be fruitless. *See Abascal,* 564 F.2d at 826 (citation omitted); *Kalustian,* 529 F.2d at 590.

C. Individualized Showing of Necessity

▮ Finally, relying on *Castillo–Garcia,* 117 F.3d at 1179, and *United States v. Arrington,* 216 F.3d 1088, 2000 WL 775576 (10th Cir. June 16, 2000) (unpublished), Defendants argue that the Affidavits failed to demonstrate necessity as to each Defendant.[4] Neither the cases cited by Defendants nor the statute impose such a requirement.

First, the court in *Castillo–Garcia,* 117 F.3d at 1193–95, did not suppress the wiretap evidence based on the lack of a particularized showing of necessity as to each defendant. Rather, the court suppressed the wiretap evidence because the govern-

ment failed to ·direct certain normal and routine investigative techniques against the primary user of one of the targeted telephones and failed to explain the potential futility or danger of attempting those normal investigative techniques. *Castillo–Garcia,* 117 F.3d at 1193–95. Thus, under *Castillo–Garcia,* 117 F.3d at 1193–95, the lack of an individualized statement of investigative procedures utilized against each and every defendant does not of itself invalidate the government's showing of necessity.

In *Arrington,* 216 F.3d 1088, 2000 WL 775576 at *1–3, 5–6, the court's analysis does not reveal whether Hightower was a specific target of the wiretap application. If Hightower was a primary target of the wiretap application, then the *Arrington* Order and Judgment ·is consistent with *Castillo–Garcia,* 117 F.3d at 1179. Because *Arrington,* 216 F.3d 1088, 2000 WL 775576 at *1–3, 5–6, does not indicate whether Hightower was a primary target of the wiretap application, the case does not illuminate the issue before this court. In any event, Defendants' interpretation of the *Arrington* Order and Judgment is inconsistent with *Castillo–Garcia.*

Second, the necessity showing may be made as to a drug distribution organization, rather than individuals. The court in *Castillo–Garcia* observed that no normal investigative procedures were attempted against any defendants other than Castillo–Garcia and that the government's failure to do so was not explained "in terms adequately particularized to the facts of the case." ·117 F.3d at 1196. Nevertheless the court upheld the wiretaps "in which particularized necessity showings were not made as to defendants who were named as users, interceptees, or· not named as either." *Barrios,* 994 F.Supp. at 1264. The court "measured the adequacy of 'necessity' for the wiretaps against the

---

4. 10th Cir. R. 36.3 states that "[u]npublished orders and judgments of this court are not binding precedents, except under the doctrines of law of the case, res judicata, and collateral estoppel." A similar portion of 8th Circuit Rule 28A(i), stating that unpublished opinions are not precedent, has been declared unconstitutional under Article III. *Anastasoff v. United States,* 223 F.3d 898, 2000 WL 1182813 * 1 (8th Cir.2000).

investigative techniques used in connection with" only the three defendants that the court identified as the targets of the government's wiretap applications. *Barrios,* 994 F.Supp. at 1264–65. "[T]he government is required to make specific necessity showings only as to the primary targets of the wiretaps." *Barrios,* 994 F.Supp. at 1266.

In *Killingsworth,* 117 F.3d at 1162–65, decided the same day as *Castillo–Garcia,* the court focused its necessity evaluation on the investigative efforts taken against the drug distribution organization as a target of the investigation, rather than the individuals. *Barrios,* 994 F.Supp. at 1265. "[T]he mere fact that neither the wiretap application nor the authorization order mentioned Killingsworth by name" did not "render the interception of communications to which Killingsworth was a party unlawful." *Killingsworth,* 117 F.3d at 1165.

In *United States v. Bovie,* 120 F.3d 271, 1997 WL 423114 at *3–4 (10th Cir.1997) (unpublished), the Tenth Circuit upheld this court's denial of Bovie's motion to suppress wiretap evidence, relying on the necessity showing made as to the "key participants" of the drug organization and the "primary targets" of the investigation. *Barrios,* 994 F.Supp. at 1265. "Bovie's role in the conspiracy was discovered through the authorized wiretaps of one of the primary targets of the drug conspiracy." *Barrios,* 994 F.Supp. at 1265.

In these three cases, the Tenth Circuit required particularized necessity showings only as to the primary targets of the investigation and the primary target could be the conspiracy or criminal enterprise itself. *Barrios,* 994 F.Supp. at 1265. Thus, under Tenth Circuit precedents as to the necessity determination, the investigative targets of a wiretap application may be criminal organizations as well as individuals. *Barrios,* 994 F.Supp. at 1265; *see also Crumpton,* 54 F.Supp.2d at 1007 ("the target of a wiretap investigation may be a drug organization as a whole, rather than an individual"). "[T]he government is required to make specific necessity showings only as to the primary targets of the wiretaps." *Barrios,* 994 F.Supp. at 1266. Accordingly, the showing of necessity as to the primary targets of a wiretap application, including the drug enterprise as a whole, is applicable to the other targets and interceptees.

Since the first wiretap Application in this case, the Government has identified as a target of the investigation "the members of the Manuel Carrillo drug distribution organization." (Government's Exhibit 1 ¶ 13(a); Government's Exhibit 7 ¶ 13(a)). The Government also named certain individuals as targets and interceptees. (Government's Exhibit 1 ¶ 13(a); Government's Exhibit 7 ¶ 13(a)). The Government did not merely identify an amorphous target organization without reference to individuals. Rather, the Government defined the target organization in terms of the specific individuals contemporaneously known to be probable members of the conspiracy under investigation. At the time of the wiretap Applications, the Government did not know the full scope or all of the members of the Carrillo drug distribution conspiracy.

The Applications sought wiretaps of two cellphones and a digital pager utilized by Carrillo and Atayde. The Affidavits addressed the necessity of the wiretaps as to the drug organization and as to certain named individual members of the organization. The Affidavits extensively supported the necessity of the wiretaps as to Defendants Carrillo, Atyade, and Luna. Defendants Carrillo, Atayde, and Luna continued to be subjects of the investigation when the Government applied for 99–WT–6–Z. Merely because facts have been previously set forth in an earlier affidavit does not render those facts unreliable as to a subsequent affidavit. The necessity for the initial wiretap Application can continue to exist and apply to subsequent wiretap applications. *See Dennis,* 786 F.2d at 1035; *United States v. Orozco,* 630 F.Supp. 1418, 1512, 1515 (S.D.Cal.1986).

Defendant Castorena argues that, although he was not mentioned in the Applications as a target, the Government actually considered him a primary target from the outset. Therefore, Castorena argues, the Government was required to make an individualized showing of necessity as to him. The evidence does not support Castorena's contention. The evidence demonstrates that, while Officer Akens knew Castorena's identity prior to this investigation, he did not learn of Castorena's involvement in the charged crimes until during 99–WT–6–Z.

Necessity for the wiretaps has been shown as to the primary targets of the wiretap Applications, including the drug enterprise as a whole. This showing of necessity applies to the other targets and interceptees.

■ Third, Defendants' argument that the government is required to demonstrate necessity as to each potential target or interceptee is inconsistent with the body of law governing wiretaps. Defendants' argument is inconsistent with the law in that Defendants would require virtual exhaustion of traditional investigative methods as to each and every Defendant. It is axiomatic that a wiretap authorization can be issued even if every possible means of investigation has not been tried. The Tenth Circuit has specifically held that "[t]he 'necessity' requirement of Title III is not an 'exhaustion' requirement." *Castillo–Garcia,* 117 F.3d at 1187. "[T]he government need not exhaust or explain its failure to exhaust every conceivable investigative procedure before resorting to wiretapping." *Castillo–Garcia,* 117 F.3d at 1188 (citation omitted). The wiretap statute "does not mandate the indiscriminate pursuit to the bitter end of every non-electronic device as to every telephone *and principal in question* to a point where the investigation becomes redundant or impractical or the subjects may be alerted and the entire investigation aborted by unreasonable insistence upon forlorn hope." *Bennett,* 219 F.3d at 1122 (internal quotation marks and citation omitted) (emphasis added).

Drug trafficking investigations typically are and this investigation in particular was dangerous. "[T]he government's failure explicitly to explain" its use or non-use of "normal investigative techniques will not be fatal to its wiretap application if it is clear, under the government's recitation of the facts of the case, that requiring the government to attempt the unexhausted and unexplained normal investigative techniques would be unreasonable." *Castillo–Garcia,* 117 F.3d at 1188. "[T]he government may obtain a wiretapping warrant without trying any other methods of investigation, if it demonstrates that normal investigatory techniques reasonably appear to be unlikely to succeed if tried, or to be too dangerous to try." *Castillo–Garcia,* 117 F.3d at 1187 (citations omitted). Requiring a personalized showing of necessity with respect to every Defendant is inconsistent with the law permitting wiretaps where no normal investigative techniques were tried but all such techniques reasonably appeared either unlikely to succeed if tried, or too dangerous to try.

The necessity requirement of § 2518(1)(c) may be met by an explanation of why it appears unlikely that traditional investigative procedures would succeed in achieving the objectives of the investigation and the objectives of an investigation may include, *inter alia,* identification of all of the members of a conspiracy and determination of the scope of the conspiracy. *See Carneiro,* 861 F.2d at 1178 (necessity shown when traditional methods of investigation proved ineffective in revealing the sources and scope of the drug operation); *Dennis,* 786 F.2d at 1037 (it is the nature of the suspected activity being investigated as well as the information about the activity that is being sought that substantiates the applicant's claim that electronic surveillance is necessary); *United States v. Newman,* 733 F.2d 1395, 1399 (10th Cir. 1984) (necessity requirement met where conventional surveillance and confidential

informants had revealed Newman's involvement but not his sources or the dimensions of the conspiracy); *United States v. Sorapuru*, 902 F.Supp. 1322, 1327 (D.Colo.1995) (citation omitted) ("Sufficient justifications for the use of electronic surveillance include the identification of all the members of a conspiracy, learning the precise nature and scope of the illegal activity, the apprehension of accomplices, and the determination of the dimensions of an extensive conspiracy"); *Bennett*, 825 F.Supp. at 1525–26 (citations omitted) (necessity for wiretap shown where normal investigative measures failed to identify the members and scope of a conspiracy or · the higher-level suppliers); *Orozco*, 630 F.Supp. at 1514 (necessity requirement satisfied by explanation that alternative investigative techniques would not succeed in identifying the persons supplied by and supplying the drug organization). At the time of a wiretap application, the government will not know the scope or every member of a conspiracy under investigation. Requiring a personalized showing of necessity with respect to every defendant ultimately indicted in a case is inconsistent with the government's permitted pursuit of the objectives of a criminal investigation.

Defendants argue that the court cannot allow the government to define the objectives of an investigation or the targets of a wiretap application. The court disagrees. A reviewing judge is not an executive officer, vested with discretion over law enforcement policy and decisions. Absent violation of the Constitution or a federal statute, the reviewing court cannot invade the province of the executive, whose function it is, within legal limits, to decide how to enforce the law. The Constitution empowers the judiciary to thwart the will of the other branches only when their behavior is not in accordance with law. Accordingly, selection of the targets and objectives of an investigation of a drug conspiracy is a law enforcement decision that is not appropriately made by the courts.

Defendants' argument is inconsistent with the requirement that the showing of necessity in an affidavit supporting a wiretap application must be tested in a practical and common-sense fashion under the totality of the circumstances. *Castillo–Garcia*, 117 F.3d at 1187, 1194 (citations omitted); *Armendariz*, 922 F.2d at 607–08 (citation omitted). Defendants' argument that the government must demonstrate individualized necessity as to each potential target or interceptee is contrary to a practical and common-sense analysis of the necessity requirement. At the time of a wiretap application, investigators do not know the identities of all the participants or their roles in a drug organization. Defendants' argument that the government must demonstrate necessity as to each and every defendant is also contrary to the court's duty to consider an affidavit as a whole and assess the showing of necessity under the totality of the circumstances. *See Kail*, 612 F.2d at 447 (although affidavit was not as detailed with respect to one co-conspirator when compared with its description of others, affidavit read as a whole established futility of using normal investigative procedures for all principals); *United States v. Baker*, 589 F.2d 1008, 1012 (9th Cir.1979) ("particularized need for wiretap may be established as to several principals and their telephones, depending upon the circumstances alleged, not only by a minutia of detail discretely directed, but by persuasive facts pertaining in common to all of the principals and their telephones"). Requiring law enforcement officials to attempt all of the alternative investigation techniques against each individual target or interceptee, named or potential, would be unreasonable and inconsistent with the law governing the authorization of wiretaps.

Similarly, the government has no duty to establish probable cause as to each and every interceptee of a wiretap; rather, it is sufficient that there is probable cause to tap the telephone. *Nunez*, 877 F.2d at 1472 n. 1 (citations omitted). In addition, an application and order for a wiretap need only identify by name such persons

as the government has probable cause to believe are committing an offense for which the wiretap is sought. *United States v. Russo*, 527 F.2d 1051, 1056 (10th Cir.1975); *Crumpton*, 54 F.Supp.2d at 1011. The language of §§ 2518(1)(b)(iv) and 2518(4)(a) both anticipate "interception of calls of people whose identities are not known at the time of the application and order." *United States v. Figueroa*, 757 F.2d 466, 470 (2d Cir.1985). "The clear implication of this language is that when there is probable cause to believe that a particular telephone is being used to commit an offense but no particular person is identifiable, a wire interception order may, nevertheless, properly issue under the statute." *Kahn* 415 U.S. at 157, 94 S.Ct. 977. Requiring a personalized showing of necessity with respect to every Defendant is inconsistent with the law governing probable cause and identification for wiretaps.

The court finds that a sufficient showing of necessity has been made as to the primary targets of these wiretaps, including the criminal enterprise itself. Each Application and Affidavit contained substantial factual information particular to the primary targets of the wiretaps. As to all three Applications, the court is satisfied that the required showing of necessity was made as to all Defendants.

VI.  *Franks* Issue

■■■ Defendants argue that the Affidavits in support of the Applications suffer from material misrepresentations and omissions regarding the requirement under § 2518(1)(c) for "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." Specifically, Defendants argue that because Officer Akens stated that he has "not set forth each and every fact learned during the course of this investigation," and because Officer Akens did not include certain facts, the affidavit was false and misleading. ˙(*See* Government's Exhibit 1 ¶ 12). Defendants assert that they

are entitled to an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), to adduce further evidence regarding the affiant's misstatements or omissions regarding the necessity showing for the wiretaps.

In *Franks v. Delaware*, the Supreme Court held that a defendant is entitled to an evidentiary hearing upon "a substantial preliminary showing that a false statement knowingly or intentionally, or with reckless disregard for the truth, is included by an affiant" in a search warrant affidavit. 438 U.S. at 155–56, 98 S.Ct. 2674. The Supreme Court put it this way:

> There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of mere negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant. Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity is set to one side, there remains sufficient content in the warrant affidavit, . . . no hearing is required.

*Franks*, 438 U.S. at 171–72, 98 S.Ct. 2674. While the *Franks* decision only concerned the inclusion of false material in a search warrant affidavit, courts have recognized that the *Franks* logic extends to deliberate

or bad faith omissions of a material fact and to affidavits in support of electronic surveillance. *See United States v. Charles,* 213 F.3d 10, 24 (1st Cir.2000) (citation omitted); *United States v. Bankston,* 182 F.3d 296, 305 (5th Cir.1999); *United States v. Green,* 175 F.3d 822, 828 (10th Cir.1999) (citations omitted); *Ippolito,* 774 F.2d at 1485–87 and n. 1. "[A] district court reviewing the validity of a wiretap order must examine the application to see if it contained material misstatements or omissions regarding the necessity of the wiretap." *Carneiro,* 861 F.2d at 1176.

First, to the extent that Defendants' *Franks* argument is premised upon their position that the Government is required to demonstrate necessity as to each and every target and interceptee, their *Franks* argument is foreclosed by the court's determination in part C. of this Memorandum Opinion and Order, above, that the necessity showing is mandated only as to the primary target or targets of a wiretap application.

Second, the court has previously addressed the issue of material omissions in the Affidavits within the context of Defendants' requests for disclosure of the identities of the confidential informants. The court has already determined (and Defendants have essentially conceded) that Defendants have not made the preliminary showing required by *Franks* that the affiant deliberately or in bad faith misstated or omitted any material facts. Accordingly, an evidentiary hearing is not required.

Third, the court has since conducted a two-day evidentiary hearing on the issues raised by Defendants regarding the necessity for the wiretaps, wherein Defendants never the less examined Officer Akens regarding material omissions from the Affidavits. The court notes that a suppression hearing "is often warranted in wiretap cases to address statutory issues not present in conventional search warrant cases, such as whether electronic surveillance was necessary." *United States v. Ozar,* 50 F.3d 1440, 1445 (8th Cir.1995). However,

"the need for a hearing on those statutory issues is an improper basis for expanding the very limited circumstances in which a *Franks v. Delaware* hearing is appropriate." *Ozar,* 50 F.3d at 1445.

The court must focus its *Franks* analysis not on what the Government could have learned with more investigation, but on what the Government actually knew when it prepared the Affidavits in support of the wiretap Applications. "[U]nless the government has lied to the issuing judge, the suppression issue should turn on what was in the government's affidavits, not on what defendants assert with the benefit of hindsight the government should have known." *Ozar,* 50 F.3d at 1445–46. "[R]ecklessness may be inferred from the fact of omission of information from an affidavit only when the material omitted would have been clearly critical" to the findings of the issuing judge. *Ozar,* 50 F.3d at 1445 (internal quotation marks and citation omitted); *see also Ippolito,* 774 F.2d at 1485–86.

Defendants still have not made any showing, much less a substantial showing, of material misstatements in or omissions from the wiretap Affidavits. In fact, the evidence indicates that Officer Akens did not recklessly or deliberately make any material omissions from the Affidavits. (*See e.g.* Government's Exhibits 13 pp. 21–25 and 14 p. 2 as evidence of Akens' intent). The evidence also shows that the alleged omitted information would have had no effect on the issuing judge's determination that the wiretaps were necessary. *See Ippolito,* 774 F.2d at 1485–86. There is no basis for suppression of any evidence based on a *Franks* violation.

VII. Probable Cause for the Wiretap Order

Defendant Licon (joined by all other Defendants) argues in his written motion that the Affidavits in support of the Applications for interception of electronic communications failed to establish probable cause that he "was involved in drug dealing with Carrillo's organization." Defen-

dants presented no evidence or argument at the hearing regarding the alleged lack of probable cause.

The probable cause required for the issuance of a wiretap order is the same as that which is necessary to obtain the issuance of a search warrant. *Armendariz,* 922 F.2d at 608 (citation omitted). Probable cause is established from the totality of the circumstances. *Nunez,* 877 F.2d at 1472 (citation omitted). "Probable cause is a common-sense standard that requires facts sufficient to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Mesa–Rincon,* 911 F.2d at 1439 (internal quotation marks and citation omitted); *see also United States v. Diltz,* 622 F.2d 476, 481, 482 (10th Cir.1980) (citation omitted). Reviewing an application for a wiretap, the court determines whether there is probable cause to believe that a particular offense has been, is being, or is about to be committed, and that conversations related to the offense will be overheard. 18 U.S.C. § 2518(3)(b).

The court's review of the Affidavits in support of the Applications and the evidence presented at the hearing reveals ample probable cause for 99–WT–3–Z, 99–WT–4–Z, and 99–WT–6–Z. The Affidavits described a large-scale drug distribution organization supported by a detailed recitation of evidence. The Affidavits described observations of drugs, guns, and numerous drug deals by confidential informants and law enforcement officers. Probable cause existed based on a practical assessment of the credibility and reliability of the information under the totality of the circumstances. *See Zambrana,* 841 F.2d at 1332. Based on the allegations contained in the Affidavits, the court finds that there was sufficient probable cause to believe an ongoing conspiracy existed to distribute cocaine, methamphetamine, and crack cocaine by the use of the targeted telephones and pager. While the Government was not required to establish probable cause as to each and every interceptee, *see Nunez,* 877 F.2d at 1472 n. 1 (citations omitted), the court's review of the Affidavits in support of the Applications also reveals ample probable cause to believe that Defendant Licon was actively involved in the Carrillo drug distribution organization. (*See* Government's Exhibit 1 ¶¶ 112, 113, 115, 121, 179; Government's Exhibit 7 ¶¶ 39, 80). Sufficient probable cause existed for 99–WT–3–Z, 99–WT–4–Z, and 99–WT–6–Z.

The court now being sufficiently advised, IT IS ORDERED:

1. Defendant Carrillo's Motion to Suppress Intercepted Electronic and Wire Communications (filed September 21, 2000) is DENIED.

2. Defendant Hinojosa Gonzales' Motion to Suppress Electronic Communications and for *Franks* Hearing (filed September 25, 2000) is DENIED.

3. Defendant Atayde's Motion to Suppress Intercepted Communications (filed September 25, 2000) is DENIED.

4. Defendant Luna's Motion to Suppress Intercepted Electronic and Wire Communication (filed September 26, 2000) is DENIED.

5. Defendant Licon's Motion to Suppress Wiretap Evidence and for a *Franks* Hearing (filed September 26, 2000) is DENIED.

6. Defendant Castorena's Motion to Suppress Wiretaps (filed September 22, 2000) is DENIED.

7. Defendant Olivas' Motion to Suppress Evidence Derived from Wiretaps 99–WT–3–Z, 99–WT–4–Z, 99–WT–6–Z, and 99–WT–9–Z (filed September 25, 2000) is DENIED.

8. Defendant Pacheco–Vasquez' Motion to Suppress Wiretap Evidence (filed September 25, 2000) is DENIED.

9. Defendant Mark Jones' Motion to Suppress Intercepted Wire Communications (filed August 25, 2000) is DENIED.

10. Defendant Brandy Jones' Motion to Suppress Evidence Seized Pursuant to Wiretap (filed September 24, 2000) is DENIED.

11. Defendant Carrillo's Motion to Join in Co–Defendant Motions to Suppress Intercepted Electronic and Wire Communications (filed September 21, 2000) is GRANTED.

12. Defendant Licon's Motion for Leave to Join the Wiretap Suppression Motions of CoDefendants (filed September 26, 2000) is GRANTED.

13. Defendant Jiron's Motion to Join Co–Defendant's [sic] Motions to Suppress Evidence Seized Pursuant to Wiretap (filed October 13, 2000) is GRANTED.

14. Defendant Castorena's Motion to Join in Specific Motions Filed by Co–Defendants (filed May 9, 2000) is GRANTED.

15. Defendant Morales' Motion to Adopt (filed October 4, 2000) is GRANTED.